Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION


FRANK L. SNIDER, III,

                PLAINTIFF,

vs.                              Case No. 1:10-CV-100

CITY OF CAPE GIRARDEAU, ET AL.,

                DEFENDANTS.


DEPOSITION OF MATTHEW PETERS

TAKEN ON BEHALF OF THE PLAINTIFF


JANUARY 7, 2011

MATTHEW PETERS 1/7/2011

Page 2

1                     INDEX PAGE

2

3                     EXAMINATION

4    QUESTIONS BY MR. DOTY                     5

5                     EXHIBITS

6    Deposition Exhibit 1                     13

7    Deposition Exhibit 2                     15

8    Deposition Exhibit 3                     27

9

10

11   (Exhibits attached)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MATTHEW PETERS 1/7/2011

Page 3

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF MISSOURI

3                         EASTERN DIVISION

4

5    FRANK L. SNIDER, III,

6                   PLAINTIFF,

7    vs.                          Case No. 1:10-CV-100

8    CITY OF CAPE GIRARDEAU, ET AL.,

9                   DEFENDANTS.

10

11        DEPOSITION OF MATTHEW PETERS, produced, sworn

12   and examined on behalf of the Plaintiff, between the

13   hours of 10:15 and 11:05 at the offices of Spradling

14   & Spradling, 1838 Broadway, in the City of Cape

15   Girardeau, State of Missouri, on the 7th day of

16   January, 2011, before Linda DeBisschop, CCR and

17   Notary Public within and for the State of Missouri.

18

19

20

21

22

23

24

25

MATTHEW PETERS 1/7/2011

Page 4

```
 1                A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4        Mr. Grant R. Doty

 5        ACLU of Eastern Missouri

 6        454 Whittier Street

 7        St. Louis, Missouri  63108

 8        (314) 652-3114

 9        grant@aclu-em.org

10    FOR THE DEFENDANTS:

11        Mr. A. M. Spradling, III

12        Spradling & Spradling

13        1838 Broadway

14        Cape Girardeau, Missouri  63702

15        (573) 335-8525

16        spradlaw@swbell.net

17    Also present:  Michael Hill, ACLU

18                   Carl Kinnison, Chief of Police

19

20    ALSO PRESENT:

21    Linda DeBisschop, CSR

22    Midwest Litigation Services

23    711 North Eleventh Street

24    St. Louis, Missouri  63101

25    314-644-2191
```

MATTHEW PETERS 1/7/2011

Page 5

1    IT IS HEREBY STIPULATED AND AGREED by and between

2    counsel for Plaintiff and counsel for the Defendant

3    that this deposition may be taken in shorthand by

4    Linda DeBisschop, CSR and Notary Public, and

5    afterwards transcribed into typewriting, and the

6    signature of the witness is waived

7

8                          *****

9

10                    MATTHEW PETERS,

11   of lawful age, being produced, sworn and examined on

12   behalf of the Plaintiff, deposes and says:

13

14                    EXAMINATION

15   QUESTIONS BY MR. DOTY:

16       Q   Could you give us your name and spell your

17   last name?

18       A   Matthew Peters.  P-E-T-E-R-S.

19       Q   Have you been to a deposition before?

20       A   No.

21       Q   Do you know what to expect here?  I mean, we

22   will be asking questions about the case?

23       A   Kind of.

24       Q   There are no trick questions for you.  Have

25   you taken any medication or anything that would

Page 6

1    prevent you from answering questions?

2        A    No.

3        Q    And you've talked with your attorney or

4    other people in preparation for this.  Do you have a

5    sense of what you will be asked in these questions?

6        A    Yes.

7        Q    When did you first become aware of the

8    Missouri's flag burning statute?  Excuse me, flag

9    desecration statute.

10       A    When did I become aware of it?

11       Q    Yes.

12       A    I would say in the academy.  Just flipping

13   through the book I came across it.

14       Q    And what book is this?

15       A    Like a hand-held, it's what we call the blue

16   book.  It's a guide book for Missouri state laws.

17       Q    And in the academy, is this a city academy

18   or is this a state academy?

19       A    It's ran by the university here.

20       Q    And the university here is?

21       A    Southeast Missouri State University.

22       Q    When we talk about the production of a

23   document, we talk about police officers and

24   attending different places.  Do all police officers

25   attend the same academy or is it possible they go to

MATTHEW PETERS 1/7/2011

Page 7

1  different academies?

2      A   It's possible they go to different

3  academies.  They didn't cover this necessarily.

4  It's just that's where you get your blue book.  I

5  just saw it flipping through it I saw it.  So I kind

6  of remembered it, but it's not like they covered

7  that individually.  I just know it is in that book.

8      Q   And is it just a listing of the statutes or

9  does it say here is speech statutes?

10     A   No.  It is Missouri criminal law basically.

11 It's just a quick reference.  It kind of gives you a

12 brief description of what, I guess, justifies that

13 particular law to be broken.

14     Q   Would all the police officers, if they went

15 to different academies, receive this blue book?

16     A   I don't know what anybody else receives.

17     Q   But SEMO does?

18     A   Yes.

19     Q   I mean, we can get this perhaps with the

20 chief.  Do you know how many of the officers go to

21 SEMO?  Is that the standard most common place that

22 you all go?

23     A   I have absolutely no idea.

24     Q   Does it just list the language of the

25 statute in this blue book?

MATTHEW PETERS 1/7/2011

Page 8

```
 1       A   I don't understand.

 2       Q   Let's talk about, do you recall the terms of

 3   the statute?  I mean, what is criminal in flag

 4   desecration?  What would be considered criminal?

 5       A   I can't recite it specifically, no.  I mean,

 6   I don't even want to give it a shot.

 7       Q   Would you know it if you saw it though?

 8       A   I wouldn't know it if that's exact.  Unless

 9   it was from that particular book, I don't know.  I

10   mean, I don't understand your question exactly.

11       Q   We just drove down from St. Louis today and

12   it was Broadway or whatever road we took off of 55

13   and lots of flags flying.  We drove by Osage Center.

14   Do you know Osage Center there on the right side?

15       A   Kingshighway.

16       Q   So driving down Kingshighway and on the

17   right side we see Osage Center and we drive in and

18   look at their flag and it is terrible.  It is

19   tattered.  It is ripped.  Do you go in and issue a

20   citation based on your knowledge of the statute for

21   that?

22       A   I would have to reference that book again.

23   As far as I believe the way it's written in that

24   book is that a person basically purposely tears it

25   up or defaces it in some way.  I don't think by
```

MATTHEW PETERS 1/7/2011

Page 9

1   nature, which is what I would assume there, doesn't

2   cover nature tearing it up.

3       Q    So it's possible that a flag could be ripped

4   and wouldn't violate the statute based on your

5   knowledge?

6       A    Absolutely.

7       Q    Let's talk about the charge.  Do you have a

8   charge book as you would write out a charge for

9   someone that you would consult in writing out what

10  they violate?

11      A    That's probably what we're talking about.

12      Q    The blue book?

13      A    Yes.

14      Q    So you have that access in your office?

15      A    Yes.

16      Q    You consulted that on the day that you

17  charged him with flag desecration?

18      A    The day that I applied for the warrant, yes.

19      Q    You pulled out the blue book?

20      A    Yes.

21      Q    And you read the statute?

22      A    Yes.

23      Q    You arrived back at the station after this

24  incident?

25      A    Yes.

MATTHEW PETERS 1/7/2011

1    Q   And you went to the blue book and said I

2    need to look up flags?

3    A   It was brought up to my attention because I

4    originally wrote a littering ticket because he had

5    thrown the flag out in the middle of the street and

6    it was brought to my attention of Missouri's State

7    Statute.  Like I said, we didn't really cover that.

8    It was just kind of me flipping through that book.

9    I vaguely remembered it and I said, well, let me

10   look it up and so that's when I looked it up.

11   Q   So let's start with who brought it to your

12   attention?

13   A   I can't tell you exactly who brought it to

14   my attention.

15   Q   Prosecutor Swingle?

16   A   No.

17   Q   But it was another police officer?

18   A   Yes.

19   Q   Was it the chief?

20   A   No, probably not at that time.  I don't

21   remember who was there.  It was not the chief.

22   Q   Do you have logs though?  I mean, we could

23   figure out who was at the station that day?

24   A   It could have been between two platoons that

25   were on.  I have no idea.  I can't remember exactly

MATTHEW PETERS 1/7/2011

Page 11

1    who reminded me of this.

2        Q    You drove back to the station?

3        A    Yes.

4        Q    And were you thinking at that point I need

5    to look up flags?

6        A    I don't know what I was thinking at that

7    time.  I just wrote a littering ticket and was

8    coming back to the station with evidence.  I had to

9    put the flag in evidence.

10       Q    And you got back to the station?

11       A    Yes.

12       Q    So you didn't think about flag desecration

13   at this point?

14       A    I don't know what I thought then.  I mean,

15   it's tough to say what I thought a year and a half

16   ago coming back to the station after a particular

17   call.

18       Q    When you were talking to Mr. Snider, what

19   did you ask him?

20       A    When I first went out there?

21       Q    I'm just looking at --

22       A    Well, I went out there twice.  That's why

23   I'm asking.

24       Q    The first time not to go arrest him.  The

25   first time when you went there for -- what was the

MATTHEW PETERS 1/7/2011

Page 12

1    reason you went out there for, what was the call?

2         A    The dispatch was a dispute between

3    neighbors.

4         Q    So no reference to the flag at this point?

5         A    No.  I had no idea.

6         Q    So you arrived on the site.  Did you talk to

7    the neighbor?

8         A    No.

9         Q    You didn't talk to her?

10        A    No.

11        Q    And so what was the first thing that you

12   did?  You went to talk to Mr. Snider?  Did you see

13   the flag?

14        A    I saw the flag and I went and picked it up.

15        Q    And then you talked to Mr. Snider?

16        A    Well, at that point I had no idea what had

17   happened and I had no idea who Mr. Snider was.  He

18   was the closest there, so I asked him what was this

19   doing out there.  I had no idea if he was involved

20   in the dispute or he was not involved in the

21   dispute.

22        Q    Was your inclination that it was him that

23   put the flag there?

24        A    No, I had no idea.

25        Q    We will put it into evidence, but I think

MATTHEW PETERS 1/7/2011

Page 13

1    you all provided it, the incident report.

2                        (Deposition Exhibit Number 1

3                        marked for identification.)

4        Q    (By Mr. Doty) So you have Exhibit 1 which

5    I've handed you.  Could you identify that for us?

6        A    Yes.  It looks like the police report.

7        Q    Is it the police report that you filled out?

8        A    Yes, sir.

9        Q    At the first?

10       A    At the first incident.

11       Q    When you arrived?

12       A    Yes, on October 20.

13       Q    You arrived for the dispute.  So what did

14   you talk to him about?  What did you ask him?

15            MR. SPRADLING:  Snider?

16       Q    (By Mr. Doty) Yes, I'm sorry, Mr. Snider.

17   What did you ask Mr. Snider?

18       A    I asked him why the United States flag was

19   laying in the road.

20       Q    And what did he say?

21       A    Snider stated he had torn up the flag and

22   threw it in the road.

23       Q    And did he say why he did that?

24       A    I asked him why he would do such a thing and

25   he replied, because my lighter didn't work.

MATTHEW PETERS 1/7/2011

Page 14

```
 1      Q    Did he give a reason for his --

 2      A    Snider continued to say he hated the United

 3  States because it was the country's fault he could

 4  not find a job.

 5      Q    So he was making some expressive statement?

 6      A    Yes.

 7      Q    And, at this point, did you think that he

 8  had broken -- I mean, did the flag desecration law

 9  of Missouri come to mind at that point?

10      A    No.

11      Q    So you issued him a citation?

12      A    I did.

13      Q    And then you went back to the station?

14      A    Right.

15      Q    And someone suggested, actually, I think

16  your words were it was quote brought to my

17  attention?

18      A    Right.

19      Q    And your testimony is you don't remember?

20      A    I honestly can't tell you.  I have no idea.

21      Q    But it was another police person?

22      A    Yes.

23      Q    And it wasn't Prosecutor Swingle?

24      A    No.

25      Q    And this was all that same day?
```

MATTHEW PETERS 1/7/2011

Page 15

```
 1      A   Yes.
 2      Q   I mean, this wasn't you coming back the next
 3  day because the arrest happened when?
 4      A   On the 23rd of October.
 5      Q   So that was three days later?
 6      A   Yes.
 7      Q   When did you write your probable cause
 8  statement?
 9      A   I don't know.  I would have to look at it.
10                      (Deposition Exhibit Number 2
11                      marked for identification.)
12      Q    (By Mr. Doty) So could you tell us what
13  this is?  We've handed you Exhibit 2.
14      A   This is a probable cause statement.
15      Q   And this is something that you drafted
16  yourself?
17      A   Yes.
18      Q   Someone didn't draft it for you and then you
19  signed it?
20      A   Correct.
21      Q   Did someone dictate to you what you were
22  going to put in this statement?
23      A   No.
24      Q   No one stood over your shoulder or e-mailed
25  you or suggested this  --
```

MATTHEW PETERS 1/7/2011

Page 16

```
 1      A    No.

 2      Q    We now have implicated the statute, correct?

 3      A    Yes.

 4      Q    So your desecration of the U.S. flag.  What

 5  made you decide to do Missouri State Statute versus

 6  your city ordinance that outlaws the same thing?

 7      A    I can't tell you what I was thinking back on

 8  October 20.

 9      Q    Did you consider the ordinance as an

10  alternative?

11      A    No.  Actually, I probably was a little more

12  familiar with the state statute book than the

13  ordinance book.

14      Q    Did you know there was an ordinance that

15  mirrored it?

16      A    I don't know what I knew at that time.  I

17  don't know.  I can't tell you what I knew at that

18  time or not.  I knew of the state one just because I

19  flipped through that book.

20      Q    But at that time you said I'm going to write

21  up the statute.  I mean, you didn't say I've got an

22  ordinance, I've got the city, let's make a call?

23      A    No.

24      Q    Have you looked at the city ordinance?

25      A    Yes.
```

MATTHEW PETERS 1/7/2011

Page 17

1     Q   So do you know it outlaws basically the same
2  thing?
3     A   Yes, it pretty much mirrors the state.
4     Q   Do you recall the differences?
5     A   No, I don't know.  Like I said, this is one
6  case of hundreds that I've dealt with even since
7  then.
8     Q   But your job is to know the law?
9     A   Correct.
10    Q   So if I went outside here and burned a
11 Missouri State flag, would you arrest me?
12    A   I would have to look up the ordinance or the
13 state statute.  Right now, I guess there is a
14 Supreme Court judgment, so it would be pretty silly.
15    Q   Okay.
16    A   I mean, there are other ordinances that
17 would cover what you're doing if you were out there
18 burning a flag as far as negligently burning out in
19 the city street.
20    Q   But, I mean, have you been told not to
21 arrest people for burning the flag now?
22    A   Have I been told not to, no.
23    Q   And charging them with Missouri statute?
24    A   No.
25    Q   You've not been told that?

```
 1      A   No.
 2      Q   So why wouldn't you arrest me?  I mean, you
 3   said it would be silly.  I'm not disagreeing with
 4   that assessment.
 5      A   I wouldn't put myself in this position
 6   again.  If there was another law broken --
 7      Q   You would try to find another law?
 8      A   I have to enforce the law whatever is on the
 9   books.
10      Q   Do you know then is the state law on the
11   books?
12      A   As far as I know it is still in, so I guess
13   I would have to.  I can't say what I would do.  It's
14   not happening, so I can't hypothetically speak.
15      Q   But, I mean, if your interest is avoiding a
16   situation like this, have you not talked to other
17   people about this?
18      A   I would take it as the situation arises and
19   call somebody in my chain of command.
20      Q   So no one in the chain of command has
21   articulated this problem of the flags?
22      A   No.
23          MR. SPRADLING:  Let me interpose an
24   objection to the question because there are certain
25   issues relative to burning a flag that may be
```

MATTHEW PETERS 1/7/2011

Page 19

1    expressive speech that may be part of the Supreme

2    Court decision, but there may be other factors that

3    may not make it expressive speech that may come in

4    to implicate the statute or the ordinance.

5            It's a hypothetical question based on

6    insufficient facts that I think an officer has to

7    determine what exists at the time.  That's why I

8    think he's having a problem and I just interpose the

9    form of the question.

10           MR. DOTY:  I will make it more clear.

11    Q   I am expressing my opinion when I go outside

12   and I am burning the Missouri state flag or the

13   American flag because I'm mad.  I'm mad at the

14   government.  I'm mad at the police department.  Do

15   you arrest me?

16    A   Once again, I mean, it's hypothetical.

17   Where are you and what are the circumstances?  Is

18   there a burn ban in effect?  There are a lot of

19   other factors.

20    Q   (By Mr. Doty) Would you charge me though

21   for under the state statute?

22    A   I would go back and type up a report of the

23   incident and let the prosecutors decide what they

24   want to do with it.

25    Q   Is that what happened here?

MATTHEW PETERS 1/7/2011

1      A    That is not what happened here.  I brought

2   up a probable cause statement.  I would have to seek

3   further advice from my chain of command.

4      Q    Because of what has happened here?

5      A    Because of what's going on here.

6      Q    But no one in your chain of command has

7   told --

8      A    Has told me not to do this?

9      Q    No one has sat down and said every police

10  officer be advised that the flag burning statute in

11  Missouri is, how would you describe it, is it

12  questionable?

13     A    I don't know.

14     Q    Is it constitutional?

15     A    That's not my decision whether it's

16  constitutional or not.

17     Q    Are you required to enforce Missouri laws?

18     A    Yes.

19     Q    Are you required to enforce city statutes?

20     A    Yes.

21     Q    Federal law?

22     A    Yes.

23     Q    Are you required to enforce those laws if

24  you know them to be unconstitutional?

25     A    I guess I really haven't run across that.

MATTHEW PETERS 1/7/2011

Page 21

1     Q   I'm asking you right now.  You know that the
2   law is unconstitutional.  Are you required to
3   enforce a law that is on the books?  It's a yes or
4   no.
5     A   I mean, I don't know.  I'm trying to think
6   of a situation or a law that meets that criteria.
7     Q   Flag burning?
8     A   I don't know.  I mean, I can't answer that
9   question.  I don't know.  I mean, if it's a law, if
10  it's a black and white law whether it is Federal,
11  state or city ordinance, then I have to enforce the
12  law.
13    Q   And you're not concerned that it's
14  unconstitutional or not.  Your only concern is that
15  it is black and white on the books?
16    A   Well, to me, if it's unconstitutional, then
17  why is it a law?  I would have to seek further
18  advice.  If there's a conflict between the two and I
19  know of that conflict, I would have to seek further
20  advice.  I would still type up a report and then
21  seek further advice from somebody who knows more
22  about it than I do.
23    Q   And did you do that?
24    A   Would I make an arrest right then, no.  I
25  would type it up and seek further advice.

MATTHEW PETERS 1/7/2011

Page 22

1     Q     Did you do that in this case?

2     A     I typed it up and sought further advice,

3   yes.  I typed up a probable cause statement.

4     Q     Who did you seek further advice from?

5     A     The prosecuting attorney.

6     Q     So you did talk with them?

7     A     Via a probable cause statement.

8     Q     So that's where you sought advice?  Did you

9   know flag burning is allowed?

10    A     No.

11    Q     Constitutionally protected?

12    A     No, I did not.

13    Q     It wasn't in your training?

14    A     No.

15    Q     Are you aware of the First Amendment?

16    A     Yes.

17    Q     And it allows people to do what?

18    A     Freedom of speech.

19    Q     Did you think burning of the flag to express

20  anger at the U.S. government constituted free

21  speech?

22    A     No, not at that time.

23    Q     Do you now realize that?

24    A     I understand the Supreme Court's decision in

25  1989.

MATTHEW PETERS 1/7/2011

Page 23

1      Q    So now you know it's unconstitutional?

2      A    Right.

3      Q    Do you have an obligation to enforce that

4   law?  You would consult?

5      A    I would consult.

6      Q    So you talked to Prosecutor Swingle?

7      A    Yes.

8      Q    Tell me what he said?

9      A    I didn't talk to him.  I said I had

10   communication with him via the probable cause

11   statement.

12      Q    So you didn't physically meet with him?

13      A    No.

14      Q    No email exchange with him?

15      A    No.

16      Q    No telephone conversation?

17      A    Not that I can recall.

18      Q    You sent him this?

19      A    Right.

20      Q    And then what happens next?

21      A    It's up to him whether he wants to file on

22   it or not or bring it to a Judge to issue a warrant

23   or not.  This was basically my facts of the case,

24   what happened and then he can take it from there

25   whether he wants to throw it aside and be like, no,

MATTHEW PETERS 1/7/2011

Page 24

1    it's okay for him to do that and that would be the

2    end of it or if he wants to take it to a Judge to

3    issue a warrant.

4        Q    And you wrote this up.  I'm looking at the

5    probable cause statement now which is Exhibit 2.

6        A    Okay.

7        Q    What did you have probable cause to think

8    that Mr. Snider did?

9        A    Desecrated the United States flag.

10       Q    So you wrote it as a violation of the state

11   statute?

12       A    Yes.

13       Q    And then what did you hear back from

14   Mr. Swingle?

15       A    I know that there was a warrant issued for

16   his arrest for that particular crime.  I didn't hear

17   back directly.  He didn't call me.

18       Q    So there was not an exchange.  You just got

19   the warrant?

20       A    Yes.

21       Q    Is it common then that the arresting officer

22   then does the warrant or does the arrest?

23       A    Yes.

24       Q    That's not uncommon?

25       A    No.

MATTHEW PETERS 1/7/2011

Page 25

```
 1      Q    What was your emotional feeling about his
 2   attempt?
 3      A    I have no idea what my emotional feeling was
 4   back on October 20 of '09.
 5      Q    Did you ask him why you would do such a
 6   thing?
 7      A    Yes.
 8      Q    Explain when you would ask someone that
 9   question why you would do such a thing?
10      A    Why he tore it up and threw it in the road.
11      Q    And then he said?
12      A    Because my lighter didn't work.
13      Q    Is that the answer you were expecting
14   someone to say when you say why would you do --
15      A    In this job I don't expect a certain answer.
16      Q    But you didn't have any emotional feeling
17   about the flag at this point?
18      A    I can't speak of an emotional feeling back
19   then.
20      Q    Do you have a feeling about people who burn
21   the flag?
22      A    No relativeness on this.  I don't know what
23   my feelings are.  I have nothing to say about my
24   feelings.
25      Q    Your feelings do matter.  I mean, were you
```

MATTHEW PETERS 1/7/2011

Page 26

1   angry?  Do you think people should respect the flag?

2       A   People can -- I have no feeling on it.  That

3   has nothing to do with me carrying out my duties as

4   a law enforcement officer.

5       Q   You started say people can what?

6       A   I don't know what I was going to say.  That

7   has no bearing on me being a police officer.  I

8   mean, the way I feel about certain things.

9       Q   But I'm curious though.  Do you respect the

10  flag?  I mean, do you love the flag?  It's not a

11  tough question.  Were you in the military?

12      A   Yes.

13      Q   I was too.  I was in the Army for 25 years.

14  I love the flag.  It will be on my coffin.  I love

15  the flag.  Do you love the flag?

16      A   I like what it stands for.

17      Q   What do you think when someone burns it or

18  rips it?

19      A   I've never really thought too much into it.

20  I've never come across it in my life until this day

21  and this day I wrote him a littering ticket to start

22  out with and then I applied for a warrant under the

23  Missouri Statute.

24      Q   And then I'm wondering what caused you to

25  change your mind?

MATTHEW PETERS 1/7/2011

Page 27

1      A    Just somebody had brought it up that there's

2   that statute.

3      Q    Did that seem more appropriate to you?

4      A    It seemed to fit more than littering.

5   Usually I think of littering as somebody throwing

6   something out of a window driving down the street.

7      Q    Like a McDonald's can?

8      A    That would be a good example.

9      Q    That's littering?

10     A    I mean, that's a more common form of

11  littering, yes.

12     Q    So there is no emotion in your decision?

13     A    No.  I would say no.

14                     (Deposition Exhibit Number 3

15                      marked for identification.)

16     Q    (By Mr. Doty) Can you tell us what Exhibit

17  3 is?

18     A    It's the flag that Mr. Snider had thrown

19  into the road.

20     Q    And where were these pictures taken?

21     A    In the break room of the police

22  headquarters.

23     Q    Why did we take a picture of these?

24     A    We typically take pictures of evidence

25  before we submit them in.

MATTHEW PETERS 1/7/2011

Page 28

```
1       Q    So these are just evidence pictures?

2       A    Right.

3       Q    Is this part of the file on this case?

4       A    Yes, it should be.  I mean, it says it in

5   there that they were placed into evidence.

6       Q    So you take the pictures.  Now, you put the

7   flag into evidence?

8       A    Right.

9       Q    Where is that flag today?

10      A    I don't know.  I'm not in charge of the

11  evidence.  We submit it into evidence and we have

12  custodians that take care of our evidence.

13      Q    Did we return it to Mr. Snider, do you know?

14      A    I have no idea where the flag is.  You would

15  have to ask the evidence guy.  It is Corporal

16  Bonham.

17      Q    I mean, traditionally, if charges are

18  dropped, do you return evidence to people?

19      A    That's not my -- I don't get into that.  I

20  don't know what they do with it.  It seems to be all

21  stored.

22      Q    How do you spell Bonham, by the way?

23      A    B-O-N-H-A-M.  I believe he said he's tried

24  to contact Mr. Snider for the flags.  I think he had

25  told me about it, but I don't know.  I know he's
```

MATTHEW PETERS 1/7/2011

Page 29

 1   tried to call him and he said his phone number that

 2   he had been given was disconnected.

 3       Q   We will talk about training later though

 4   with the chief, but I do want to know, from your

 5   perspective in the receipt of training prior to

 6   this, I know you reference the blue book as listing

 7   the state statutes?

 8       A   Right.

 9       Q   Did you ever have a class, either in

10   preparation for becoming a police officer or

11   subsequent of being a police officer, regarding

12   First Amendment free speech rights of citizens?

13       A   Not that I can recall.  Not that I can

14   recall.

15       Q   Did you ever have Fourth Amendment in your

16   training and then subsequent?

17       A   Yes.

18       Q   How often do you have training now in Fourth

19   Amendment?

20       A   It seems like all the time.  It seems like

21   every time something new comes out.  We talked about

22   that earlier.  It depends on what day of the week it

23   is.  If there is some kind of change, we get updated

24   on it.

25       Q   Is it oral updates?  Someone standing in

MATTHEW PETERS 1/7/2011

Page 30

1  front or is it a memo?

2      A    It could be anywhere from an organized class

3  to a training tip, which I believe you may cover

4  later, or just pass down orally.  I mean, it all

5  depends.

6      Q    So a change in the law.  I mean, I

7  understand it would vary, but four times a year

8  perhaps, five times or even more?

9      A    I don't know.  Like I said, usually I know

10  there is a mandated time that we have to have, but

11  then I'm sure we go above and beyond that because

12  there are changes more often than that.  I can't

13  even put a number on that.

14      Q    I probably should have asked these questions

15  earlier.  How long have you been a police officer?

16      A    Two and a half years.

17      Q    And you said you did you go from the

18  military straight to the academy or you took some

19  time off in between?

20      A    There was some time between.

21      Q    Were you an MP?

22      A    No.

23      Q    What branch, Army, Navy?

24      A    Marine Corp.

25      Q    So you were a general Marine?  What are the

MATTHEW PETERS 1/7/2011

Page 31

1    Naval Police?

2        A    The Navy?  As SP?

3        Q    SPs?

4        A    The Marines have an equivalent.  We have

5    MPs.

6        A    MP.

7        Q    And you were not an MP?

8        A    No.

9        Q    And so what year did you start at SEMO?

10       A    2008.

11       Q    How long does that take?

12       A    I want to say it was early February until

13   the end of May.

14       Q    So it is like three or four months?

15       A    I think it is a 640 hour class.  I don't

16   know if that is exact, but somewhere in there.

17       Q    Do you have an Associate's Degree or

18   Bachelor's Degree?

19       A    I have an equivalent in languages.

20       Q    So we now talked about the Fourth Amendment

21   and updates, whether it be memos, oral or classes.

22   Let's talk about the Fifth Amendment.  Do you have

23   classes on this?

24       A    Yes.

25       Q    Is it like the Fourth Amendment regularly?

MATTHEW PETERS 1/7/2011

Page 32

```
 1      A    Well, there is the mandatory time.  I know
 2   that there is mandatory training in it, but I don't
 3   know.  I don't know how often we get it.
 4      Q    Do you have a sense?  I will not hold you to
 5   it.  More or less than the Fourth Amendment?
 6      A    I don't know.  I can't put a number out
 7   there.
 8      Q    But more than the First Amendment which is
 9   zero?
10      A    Yes.
11      Q    More than zero?
12      A    Yes.
13      Q    We talked prior to getting into the station
14   and being brought to your attention about the
15   statute.
16      A    Not prior to getting to the station.
17      Q    I'm sorry.  Prior to the station you were
18   thinking litter?
19      A    Right.
20      Q    Did you consider the flag, was it garbage,
21   was it refuse, was it rubbish?  What was it at that
22   point to you?
23      A    Torn up American flag.
24      Q    But was it garbage?
25      A    It was evidence.
```

MATTHEW PETERS 1/7/2011

Page 33

1    Q   So it was evidence for the desecration?

2    A   Well, before I got to the station or

3  afterwards?

4    Q   Before you got to the station?

5    A   Before it was evidence for the littering.

6    Q   And was it garbage, yes or no?  Was it

7  garbage?

8    A   It depends on who you talk to.  One person's

9  garbage is another person's prize.  Right then it

10  had my feelings of what it was is it was evidence.

11  That's all it was.

12    Q   But evidence of littering?

13    A   Littering.

14    Q   Was it garbage to you?

15    A   I never thought of it.  I have no idea.

16    Q   Was it refuse?

17    A   It was evidence.  That's it.

18    Q   Was it rubbish?

19    A   It was evidence.  That's it.  So it was none

20  of those, it was just evidence.

21    Q   Was it paper?

22    A   No.  I don't know if it was cotton or nylon.

23    Q   Was it ashes?

24    A   No.  I don't see any burn marks.

25    Q   Was it street cleaning?  Was it a dead

MATTHEW PETERS 1/7/2011

Page 34

1   animal?  Was it an abandoned auto?

2       A    No.

3       Q    Was it a wrapping?  Was it a cigarette?

4       A    No.

5       Q    Was it animal or vegetable?

6       A    It was cotton or nylon.

7       Q    So it was a flag?

8       A    Correct.

9       Q    It was a flag that was desecrated, yes or

10  no?  It was a flag that was desecrated?

11      A    Yes.

12      Q    I appreciate it.

13          MR. SPRADLING:  We will waive his

14  signature.

15

16

17

18

19

20

21

22

23

24

25

MATTHEW PETERS 1/7/2011

Page 35

```
 1              CERTIFICATE OF REPORTER

 2          I, Linda DeBisschop, Certified Shorthand

 3      Reporter, Notary Public within and for the

 4      State of Missouri, do hereby certify that the

 5      witness whose testimony appears in the

 6      foregoing deposition was duly sworn by me; the

 7      testimony of said witness was taken by me to

 8      the best of my ability and thereafter reduced

 9      to typewriting under my direction; that I am

10      neither counsel for, related to, nor employed

11      by any of the parties to the action in which

12      this deposition was taken, and further that I

13      am not a relative or employee of any attorney

14      or counsel employed by the parties thereto, nor

15      financially or otherwise interested in the

16      outcome of the action.

17

18

19                      _____

20                      Notary Public within and for

21                      the State of Missouri

22

23

24

25
```