Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION


FRANK L. SNIDER, III,

        PLAINTIFF,

vs.                          Case No. 1:10-CV-100

CITY OF CAPE GIRARDEAU, ET AL.,

        DEFENDANTS.


DEPOSITION OF CARL KINNISON

TAKEN ON BEHALF OF THE PLAINTIFF


JANUARY 7, 2011

Page 2

1                        INDEX PAGE

2                       EXAMINATION

3    QUESTIONS BY MR. DOTY                          5

4

5

6    (NO EXHIBITS MARKED)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CARL KINNISON 1/7/2011

Page 3

1                   UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF MISSOURI

3                        EASTERN DIVISION

4

5    FRANK L. SNIDER, III,

6                 PLAINTIFF,

7    vs.                         Case No. 1:10-CV-100

8    CITY OF CAPE GIRARDEAU, ET AL.,

9                 DEFENDANTS.

10

11       DEPOSITION OF CARL KINNISON, produced, sworn

12   and examined on behalf of the Plaintiff, between the

13   hours of 11:15 and 12:15 at the offices of Spradling

14   & Spradling, 1838 Broadway, in the City of Cape

15   Girardeau, State of Missouri, on the 7th day of

16   January, 2011, before Linda DeBisschop, CCR and

17   Notary Public within and for the State of Missouri.

18

19

20

21

22

23

24

25

1                 A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4        Mr. Grant R. Doty

5        ACLU of Eastern Missouri

6        454 Whittier Street

7        St. Louis, Missouri  63108

8        (314) 652-3114

9        grant@aclu-em.org

10    FOR THE DEFENDANTS:

11        Mr. A. M. Spradling, III

12        Spradling & Spradling

13        1838 Broadway

14        Cape Girardeau, Missouri  63702

15        (573) 335-8525

16        spradlaw@swbell.net

17    Also present:  Michael Hill, ACLU

18                   Officer Matthew Peters

19

20    ALSO PRESENT:

21    Linda DeBisschop, CSR

22    Midwest Litigation Services

23    711 North Eleventh Street

24    St. Louis, Missouri  63101

25    314-644-2191

1  IT IS HEREBY STIPULATED AND AGREED by and between

2  counsel for Plaintiff and counsel for the Defendant

3  that this deposition may be taken in shorthand by

4  Linda DeBisschop, CSR and Notary Public, and

5  afterwards transcribed into typewriting, and the

6  signature of the witness is waived

7

8                         *****

9

10                   CARL KINNISON,

11  of lawful age, being produced, sworn and examined on

12  behalf of the Plaintiff, deposes and says:

13

14                   EXAMINATION

15  QUESTIONS BY MR. DOTY:

16     Q   Could you give your name for the record?

17     A   Carl Kinnison, K-I-N-N-I-S-O-N.

18     Q   And your position?

19     A   I'm the Chief of Police.

20     Q   What I just handed you was the notice of the

21  deposition.  Had you seen that before?

22     A   Yes.

23     Q   So we're here on a 30(b)(6) deposition for

24  Defendant, City of Cape Girardeau.  There are topics

25  listed on this which we will inquire of the City of

CARL KINNISON 1/7/2011

Page 6

1  Cape Girardeau.

2          Have you been designated to give testimony

3  on behalf of the city on each of these topics?

4      A   Yes.

5      Q   Let's start with topic number one which is

6  the ordinance which the city enacted which bans the

7  desecration of the flag.

8          When did you first become familiar with

9  this or first gain knowledge of this ordinance?

10     A   You know, I vaguely recall the ordinance.

11  You know, when this whole incident was brought to

12  light, had you asked me if the city had an ordinance

13  that reflected state law, I would have said I don't

14  think so, but let me check, so it's not something

15  that I consciously knew existed at the time until

16  recently.

17     Q   I should have done with him as well.  How

18  long have you been the Chief of Police?

19     A   I've been the Chief for five years, a little

20  over five years.

21     Q   Prior to that, were you a police officer in

22  the same department?

23     A   Yes.

24     Q   How long had you been there?

25     A   Almost thirty-two.

CARL KINNISON 1/7/2011

Page 7

```
 1      Q   So as a police officer, you weren't aware of
 2   it either?
 3      A   Well, like I said, when I looked at it, I
 4   vaguely remembered it, but it wasn't one of those --
 5   obviously, it is not one that we enforce often and
 6   it is just not something that we see much of.
 7      Q   Do you know when it was first enacted?
 8      A   Only because I checked.  It was 1984 and
 9   this I'm getting from the city clerk.  She did the
10   research on it and indicated that it was passed as a
11   result of several ordinances that was passed at that
12   time.
13           When a company came in to rewrite the city
14   ordinance manual, they did some research.  They
15   included some state laws that were not included in
16   our city ordinances and kind of in one felt swoop at
17   that time the city council enacted a number of
18   ordinances and this was one of them.
19      Q   And I know you got the information from the
20   clerk, but it didn't suggest it was their function
21   of someone downtown burning the flag and it's like,
22   oh, my gosh, we need to react to this?
23      A   No.  When I asked if there was any --
24   normally the way we do it now, there are council
25   letters that may suggest why a change and there was
```

Page 8

1    none of that.  There was no discussion or no council

2    letters.

3        Q    Thank you.  How many times have people been

4    charged with the ordinance?

5        A    I checked with our municipal court on that

6    and one time in 2004, August of 2004.

7        Q    Do you know the disposition?

8        A    The gentleman pled guilty and paid a fine.

9        Q    Was he similarly charged with the state

10   statute?

11       A    No.  Could not find any information on the

12   state statute, any instances of charges as a result

13   of state.  The only thing I had access to was the

14   city and there was just the one.

15       Q    Do you know his name or can we get a hold of

16   that?

17       A    I mean, I've got it somewhere here.  Here it

18   is.  The name is there on the top.

19       Q    Were you surprised that the city had charged

20   someone?

21       A    That there was one?  I kind of was.  I was

22   expecting zero, but it didn't really surprise me too

23   significantly that it was one.  I would have been

24   surprised if there were 10 or 12 or more.

25       Q    Is this something that -- are you aware of

CARL KINNISON 1/7/2011

Page 9

1    other flag desecration that happened that did not

2    result in a charge?

3        A    I'm not.

4        Q    And that's in all your time that you've been

5    there?

6        A    It's just not something we run across much.

7        Q    We're on topic two, which is the policies,

8    procedures, custom and practices of enforcement and

9    you really did answer part of it, that it has been

10   enforced once.

11            Is there an inclination that, if someone

12   violates something that's covered in both the

13   ordinance and the statute, Missouri statute, that do

14   you have a preference on which one that you would

15   charge under?

16       A    Generally it would be the city ordinance.

17   The city ordinance is obviously covering misdemeanor

18   offenses and it typically works out most of the time

19   to our advantage to go through city court.

20            Now, if there are multiple offenses and

21   one is city and one is state, we go state.  There

22   are those that we do that, but 95 percent of the

23   time, if it is a city ordinance violation compared

24   to a state law violation, we will go city.

25       Q    I mean, you do get the fines from that?

CARL KINNISON 1/7/2011

Page 10

1      A    The city general revenue fund, the municipal

2   court fines, I'm assuming, is what you are referring

3   to?

4      Q    Yes.

5      A    The city does get that, yes.

6      Q    In the time that you've been in, has there

7   been ever a notice of articulating the existence of

8   this ordinance specifically to bring it to people's

9   attention?  Bring it to the police officers'

10  attention?  We have this ordinance out there?

11     A    To my knowledge, no.

12     Q    Since this incident happened, you heard

13  earlier when we talked with Officer Peters that

14  there has not been any articulation of

15  constitutional concerns about the statute and

16  ordinance.  Is that correct, from your

17  understanding?

18     A    Well, you know, first of all, like Officer

19  Peters mentioned, I think it is pretty clear that no

20  one is going to take any action right now without

21  prior approval and I've spoken with our city manager

22  about actually removing this from our city

23  ordinance.  He's checking.  He indicated that he

24  felt there was another case out there.  I was

25  talking to Mr. Spradling about that this morning,

CARL KINNISON 1/7/2011

Page 11

1    but I'm still waiting to hear from him.

2           But personally, if it is unconstitutional

3    and non-existent, then we should remove it from the

4    city ordinance manual, so it's what we're working

5    toward doing.  I'm kind of waiting to hear from him

6    before we make any official announcement.

7        Q    I will talk about that, that's interesting

8    to know, but I understand again Officer Peters'

9    testimony was, when Fourth Amendment law changes or

10   there are updates, you are told in a memo or told in

11   a class.  Is he correct that there has not been

12   anything that has come down from you in writing?

13       A    Nothing in writing yet.

14       Q    Has there been a class on it?

15       A    No.

16       Q    Would there be a benefit to that?

17       A    Once I find out for sure from our city

18   attorney what the city's position is, then, yeah, we

19   will definitely put something out in writing and

20   indicate that the city ordinance is going to be

21   removed and, therefore, unenforceable and don't

22   enforce it, but we are still kind of waiting for

23   that to happen.

24       Q    But is it unenforceable or not?  You are

25   considering it enforceable now?

CARL KINNISON 1/7/2011

Page 12

```
 1     A    No.  Obviously, Morley has made it to -- the

 2   prosecuting attorney has indicated that he's not

 3   going to file any additional charges as a result of

 4   that so, like I said, there is a little bit of

 5   confusion because I'm still working with our city

 6   prosecutor to see about the city ordinance whether

 7   he considers that constitutional or

 8   unconstitutional, so we are still waiting for

 9   confirmation from him.

10     Q    I heard you say city prosecutor.  Did you

11   mean city administrator because you talked about the

12   administrator earlier?

13          MR. SPRADLING:  You probably meant

14   prosecutor.

15     Q    (By Mr. Doty) City attorney?

16     A    Yes.

17     Q    So that is the one you are trying to see if

18   it is constitutional or not?

19     A    As far as the ordinance goes and he was

20   doing some research and was supposed to get back.

21     Q    And this is Mr. Swingle?

22     A    No.  This is Eric Cunningham, the city

23   attorney.

24     Q    And Cunningham, how do you spell that?

25     A    C-U-N-N-I-N-G-H-A-M.
```

CARL KINNISON 1/7/2011

Page 13

1    Q    Now, he said he will not prosecute?

2    A    Well, we are in a difficult situation with

3    prosecutors in the city.  Our city attorney, who

4    handles all administrative legal issues, and then we

5    have a prosecuting attorney, who is his assistant.

6    He doesn't do any court prosecutions and that

7    position has been vacated and they have an interim

8    city prosecutor which they just announced, so we've

9    been working through two or three different

10   prosecutors over the last three months, so we are

11   kind of waiting to see who ends up in that

12   prosecuting position, but he has not indicated that

13   he would not prosecute.

14   Q    I don't know the answer to this.  You could

15   write a citation for the ordinance and it could be

16   prosecuted without any involvement of Mr. Swingle?

17   A    Yes, in the city court.

18   Q    In the city court?

19   A    Yes.

20   Q    And, although, there is some caution there

21   on your part and some recognition --

22   A    Right.

23   Q    -- that it is open ended, and so you are

24   considering it a good law?

25   A    Well, I'm kind of like Officer Peters.  I'm

CARL KINNISON 1/7/2011

Page 14

1    not sure I would consider it a good law, but I'm

2    waiting for advice from our city attorney before we

3    do anything official.

4        Q    Have you told the officers in your

5    department that you have that view that it is a

6    questionable law and do not take any action

7    without --

8        A    I have personally not told them that, no.

9        Q    Do you know of anybody who has personally

10   told them?

11       A    Not every single officer, but there is a

12   sense and we meet with the officers every morning

13   and everyone is aware of this case and knows that

14   this is an issue out there right now.

15       Q    How many officers do you have?

16       A    Seventy-four.

17       Q    When did you first raise this issue with the

18   city attorney or administrator regarding -- was it

19   after the lawsuit was started?

20       A    Yes.  He received notice of it and then

21   actually he had sent me some information and I know

22   I just recently checked with him again earlier this

23   week because today was coming up and he was still

24   checking, but it's probably been three or four weeks

25   ago.

CARL KINNISON 1/7/2011

Page 15

1     Q    Is your view and is the view of the
2   department that you are obligated to enforce laws on
3   the book that are unconstitutional?
4     A    No, not if they had been declared
5   unconstitutional.
6     Q    Did you know that burning the flag was
7   constitutionally protected?
8     A    You know, when this kind of surfaced, I
9   vaguely remembered that that may have been a Supreme
10  Court case some time back years ago.  You know, I
11  couldn't cite the case or I wouldn't have been for
12  sure but, obviously, the law was still on the books,
13  but I would have had to have done some research.
14    Q    And it was '89 and in '89 you were a police
15  officer, not the chief?
16    A    Right.
17    Q    Were you the chief when this case was
18  prosecuted in 2004?
19    A    No.
20    Q    So this would not have been -- you weren't
21  the arresting officer, were you?
22    A    No.
23    Q    Did you remember this case when it came up?
24    A    No.
25    Q    I mean 74 is a pretty big number in terms of

CARL KINNISON 1/7/2011

Page 16

1    people and you might not interact with everyone?

2        A    Right.

3        Q    Let's move to topic three, which is

4    policies, procedures and practices with respect to

5    enforcement of the statute.  Did you know the

6    statute existed?

7        A    Yes.

8        Q    Did you know it when you were the police

9    officer before being a chief?

10       A    Yes.

11       Q    Do you know if anybody has been arrested in

12   the city?

13       A    That I do not know.  You mean for the state

14   statute violation other than Mr. Snider?

15       Q    Yes, except for Mr. Snider.

16       A    That, I do not know.

17       Q    Did you try to find out?

18       A    I was going to.  In all honesty, I was going

19   to and then the time slipped away.  I was going to

20   call the prosector's office.  I don't know if they

21   have the ability to --

22       Q    Could you ask?

23       A    I will.

24       Q    I don't think there would be any questions

25   that are critical here that I would need to call you

CARL KINNISON 1/7/2011

Page 17

1   back, but if you could ask about that, that would be
2   useful for us.
3       A   And I intended to do that.
4       Q   Did you have any policies or procedures
5   written regarding this?
6       A   No.
7       Q   Just like the ordinance, nothing was --
8       A   Right.
9       Q   Do you recall someone ever talking about
10  flag burning?
11      A   No.
12      Q   Topic four is the policies, procedures,
13  customs and practices with respect to training and
14  supervising police officers regarding First
15  Amendment free speech rights.
16          Officer Peters said there's none.  He
17  hasn't had any in his training at SEMO and he didn't
18  get any since he's been a police officer.  You've,
19  obviously, been there longer.  Do you recall any
20  First Amendment training?
21      A   I remember the one thing that comes to mind
22  is an incident in St. Louis, you know, where St.
23  Louis County had arrested a guy for yelling in the
24  street using vulgar language and the Supreme Court
25  ruled that that was constitutional and I remember

CARL KINNISON 1/7/2011

Page 18

1    our department doing something back then putting out

2    a training tip or memo indicating that, you know,

3    look, just because someone is yelling doesn't mean

4    or vulgar language.

5            Because there was a time we had an

6    ordinance that prohibited vulgar language, so that I

7    remember, but that's about it.  As far as training

8    goes and First Amendment issues, it's not something

9    that you see a lot of.

10   Q    Do you remember when that was?

11   A    I was afraid you were going to ask that.

12   Q    Decade?

13   A    You know what, it could be and, as I get

14   older, I end up having to multiply or factor by two

15   or three.  I'm thinking it was in the '90s maybe.

16   That's just one that sticks out in my mind.  There

17   could have been more in First Amendment issues.  But

18   I remember that case because it changed the way we

19   actually did business as well.  As far as someone

20   yelling and standing in the middle of the street

21   using course or vulgar language, you knew that that

22   was okay and that was constitutional protected.

23   Q    Since you've been chief, any First Amendment

24   training?

25   A    Specifically, I do not attend all of the

CARL KINNISON 1/7/2011

Page 19

1    legal training that our officers go to with the

2    different subject matter experts that provide that

3    training.  Whether they touched on First Amendment

4    or not, I don't know.

5        Q    You're not responsible for that training?

6        A    We typically have -- the way Missouri is set

7    up with continuing education hours, we have POST

8    approved providers that come in.  POST is the Police

9    Officers Standards and Training.  They come in and

10   keep the course syllabus, objectives.  If they do

11   any kind of testing, whether pre-testing or

12   post-testing and then they have subject matter

13   experts that teach the course.  So we do not keep

14   any of those records and we have the certificates

15   that the officer attended, but the records are

16   maintained by the POST approved provider.

17       Q    And that's P-O-S-T?

18       A    Police Officer Standards and Training, which

19   is a department within the State of Missouri that

20   oversees police officer training.

21       Q    So unless they covered the First Amendment,

22   it hasn't been covered?

23       A    Right, yes.

24       Q    You did mention the St. Louis County one,

25   which is specific.  I mean, unless it came out as a

CARL KINNISON 1/7/2011

Page 20

```
 1    training tip or a memo, are those written products
 2    that you produce?
 3        A    They are.
 4        Q    Can we get them?
 5        A    I tried going back to see if I could find
 6    those and we've got them documented since '04, so
 7    that's about the best I could do is go back.
 8        Q    And you didn't find anything back to '04?
 9        A    You know, I knew that that was earlier than
10    that, so I didn't even look.
11        Q    Your testimony is that there's not been
12    First Amendment training unless POST covered it?
13        A    That I recall.
14        Q    Do you know, if we contacted POST and said
15    give us what Cape Girardeau Police Officers have
16    been trained, they could produce the syllabus for us
17    or the subject?  I guess, it really wouldn't be
18    useful to get a binder.
19        A    See, they have different academies that are
20    POST approved providers.  For example, at SEMO, the
21    SEMO Regional Law Enforcement Academy provides the
22    training.  They would be the one that has the course
23    syllabus on it, so you would have to know who the
24    provider was.  I don't think if you contacted POST,
25    that they would be able to say, yes, this is what
```

CARL KINNISON 1/7/2011

Page 21

1    Officer Peters or Officer Johnson received.  We

2    would have to look through each individual officer

3    certificate and find out who the POST provider was

4    and then go to that POST provider.  They are

5    mandated by law to keep those records for 50 years

6    or so.

7        Q    But you could get these, right?  These are

8    personnel records, I assume, and they would be

9    things that you would be able to get us?

10       A    I would think so, yes.  I think it is a

11   matter of just calling that POST provider and asking

12   for the information.

13       Q    I asked Officer Peters regarding his

14   training at the Academy at SEMO.  Of your 74

15   officers, I mean, do you have a general sense of

16   where they come from and where their training would

17   have occurred?

18       A    You know, I would say probably half or a

19   little more than half has probably graduated from

20   the SEMO Academy.

21       Q    And the other half?

22       A    Well, there are academies all over the state

23   and, if they are veteran police officers, they can

24   take a POST test.  If they had an equal amount of

25   training or greater amount of training in another

CARL KINNISON 1/7/2011

Page 22

1   state, they can pass the Missouri test so they would

2   have been trained in an academy in another state.

3       Q   Where were you trained?

4       A   I was here.

5       Q   So you did SEMO just like Officer Peters?

6       A   Actually, at that time it was the police

7   department was the state approved academy and that

8   was back in '79.

9       Q   So SEMO Officer Peters said did not do First

10  Amendment training, so half of your officers are

11  coming to you without this First Amendment training?

12      A   Yes.  That's probably fair.

13      Q   Do you think the other half, I mean, if we

14  drove down, does SEMO have similar --

15      A   Well, all the academies have the same

16  curriculum for the 600-hour curriculum.

17      Q   So if he didn't have it, the others wouldn't

18  have had it either?

19      A   Unless they somehow included -- basically,

20  the objectives and course outline and everything is

21  pretty much the same.  It is POST approved.  There

22  can be some changes between the academies, but it

23  has to be approved by the POST.  But, for the most

24  part, it is the same training.

25      Q   Let's go to five.  Policies, procedures and

CARL KINNISON 1/7/2011

Page 23

1   customs with respect to the Fourth Amendment.

2   Officer Peters suggested significant amount of

3   training.  How would you describe?

4        A    We certainly try.  The Fourth Amendment is

5   something that we are involved in on a day-to-day

6   basis so, therefore, we will try to do more training

7   in that area as we can.

8             So, in addition to the academy training,

9   we have inservice trainings that we provide that

10  again we have a subject matter expert.  Typically,

11  they host these on a regional basis that we will

12  send officers to.

13            We have training tips.  Training tips are

14  methods of writing down information documenting and

15  getting them read at roll calls.  When something

16  changes or is modified, we have memorandums and

17  e-mails that we use and sometimes just general

18  discussions about it

19       Q    Roll call, I mean, that is  --

20       A    Every morning, every evening.  We have

21  12-hour shifts, so it is 7:00 a.m. and 7:00 p.m.

22  When a new platoon is coming in reporting for duty,

23  they have roll call for 15 minutes and we pass down

24  a log of things that have been happening in the past

25  few days, warrant information, extra patrol areas,

CARL KINNISON 1/7/2011

Page 24

1    that sort of thing.

2        Q    So this is an opportunity to put Fourth

3    Amendment issues out there?

4        A    Yes.

5        Q    First Amendment did not get anything put out

6    at roll call?

7        A    Not that I can recall.

8        Q    But that would be the forum.  It's not

9    limited?

10       A    It's a good way to communicate it.

11       Q    I guess this topic five is Fourth Amendment

12   with respect to probable cause.  Can you speak

13   specifically about the policies and procedures with

14   respect to the probable cause?

15       A    Well, again, this kind of goes back to the

16   training, what probable cause is and what

17   constitutes probable cause.  Much of that we rely on

18   the academies to instill in the officers is the

19   difference in understanding what probable cause is

20   within that Fourth Amendment.

21            If there are cases that, for example, the

22   case that and, this is going back years ago, but

23   when the court decided that smelling marijuana

24   smoke, if you could show that you knew what

25   marijuana smoke smelled like, that that was probable

CARL KINNISON 1/7/2011

Page 25

1    cause to search a vehicle.  We would put something

2    out there.

3              There is a recent Supreme Court case.

4    This is probable cause under these circumstances.

5    If a dog sniffs and makes a positive hit.  So those

6    kind of updates.  Is that what you're asking?

7        Q   Yes, that's good.  So the Supreme Court case

8    is a good example?

9        A   Yes.

10       Q   So the constitutionality of these things

11   matters?  I mean, to the extent that a law would be

12   conflicting with the Supreme Court?

13       A   Sure.

14       Q   It is something that would matter to you

15   all?

16       A   Sure.

17       Q   Your position is is that your department

18   officers, if there's a law on the book that is

19   unconstitutional, they do not have the ability to

20   enforce that law?

21       A   Yeah.  I mean, if that specific law has been

22   declared unconstitutional, then yeah.  And in a

23   sense that's what I'm kind of waiting for here from

24   our city attorney as well for this ordinance.

25       Q   See, that's an important distinction though.

CARL KINNISON 1/7/2011

1    You're saying that -- so the Missouri statute has

2    not been declared unconstitutional for flag burning?

3         A    As I understand it, it is not.

4         Q    Is your position that your department can

5    enforce it?

6         A    Here's the way, we obviously -- the county

7    prosecuting attorney is not going to prosecute based

8    upon circumstances that we had, so if we had an

9    incident like Officer Peters said, what we would do

10   is refer it to him.  We wouldn't take anyone into

11   custody and make the arrest immediately, but we

12   would make a report of it, send it to the prosecutor

13   and say, okay, is there anything different about

14   this that you feel is constitutional?  If so, then

15   you can issue the warrant, let us know or issue a

16   court summons or whatever the process would be, but

17   as far as knowing for sure.

18              I mean, if we were told by our prosecuting

19   attorney or by someone with authority that this law

20   is unconstitutional, then we would not enforce it,

21   if that's what you're asking.

22        Q    I think I heard you.  If the Judge says

23   Missouri Statute 578.095 is declared

24   unconstitutional, you would not enforce it?

25        A    Right.

CARL KINNISON 1/7/2011

1      Q    And I heard your reference to, I think your

2   words were something along the lines of the

3   situation we have now because there is a lawsuit

4   pending?

5      A    Right.

6      Q    But prior to a lawsuit.  You have a law that

7   is not declared unconstitutional.  I mean, 578 has

8   never been declared unconstitutional, that law.  But

9   flag burning is protected.  The Supreme Court has

10   said flag desecration cannot be criminalized.

11      A    Yes.

12      Q    So the state law is inconsistent with the

13   Supreme Court.

14      A    Right.

15      Q    What do you do?  What do you tell your

16   officers?  Our law is inconsistent, but it's never

17   been declared unconstitutional.  What is your

18   position for the city on the ability to enforce it?

19      A    That we don't enforce it.  I mean, again, I

20   would confer with both the county prosecuting

21   attorney, Morley Swingle, as well as our city

22   attorney, Eric Cunningham.  As long as they are in

23   agreement with that, then our information would be

24   don't enforce it.

25      Q    Prior to an incident or do we need to wait

CARL KINNISON 1/7/2011

Page 28

1  for an incident and a lawsuit to happen?

2     A   If we were aware of it prior to the

3  incident, it would be prior to the incident.

4     Q   So you had an inkling and you remembered not

5  the exact date or the citation for the flag burning

6  law, the Supreme Court's flag burning was

7  authorized, you testified earlier --

8     A   Yeah.  Once this was brought to my

9  attention, I thought, oh, yeah, I think I do

10  remember something, but, yeah, just vaguely.  I

11  mean, it wasn't something on the top of my mind or

12  something that I had thought about.

13     Q   I do want to talk about you said you are

14  waiting now for word from the city regarding the

15  ordinance?

16     A   Right.

17     Q   What do you need to learn from them that

18  would say enforce or not enforce?

19     A   I don't understand.

20     Q   If you say you know now that the Supreme

21  Court says it is unconstitutional to ban someone's

22  desecration of the flag, what information are you

23  standing by for from the city?

24     A   Well, when I talked to the city attorney, he

25  thought there was another case out there somewhere.

CARL KINNISON 1/7/2011

1    He wanted to do some additional research.  I'm just

2    waiting for him.

3        Q    The reason I'm asking is I want to make

4    sure.  You had said if the law itself was declared

5    unconstitutional, the 578.095 and your Ordinance 17,

6    this ordinance, and I want to broaden it.  I mean,

7    these laws are not declared unconstitutional but are

8    unconstitutional.  Do you understand?

9        A    I think I understand what you're saying.

10       Q    Do you understand the distinction?  I mean,

11   I want to make sure you do understand.

12       A    Okay.

13       Q    Do you know what I mean by that?  I mean,

14   that a law could be on the books --

15       A    Right.

16       Q    -- not declared unconstitutional, but would

17   be?

18       A    Right.  Yeah, I do understand.  I will go

19   back to an example I kind of mentioned earlier,

20   Tennessee versus Gardner that changed the whole use

21   of force, police officers using deadly force.

22            Missouri had and may still have the law on

23   the books that allows police officers to kill a

24   fleeing felon.  Well, you know, we changed our

25   policy immediately, but that was obviously brought

CARL KINNISON 1/7/2011

Page 30

1    to our attention and it was clear that it was

2    unconstitutional.  Even though legally you could do

3    it, it was unconstitutional, but yet it changed our

4    way of doing business back in the mid-'80s when that

5    Supreme Court decision was passed.  So if it's

6    there, we know about it, and it's clearly

7    unconstitutional, we can change our policies.

8        Q    And when you said it was legal to kill a

9    fleeing felon, you just meant that it would be

10   consistent with the statute?

11       A    Exactly, yes.

12       Q    It wouldn't be legal?

13       A    Legal from a criminal statute.

14       Q    But you wouldn't be protected by pointing to

15   the statute?

16       A    Right.

17       Q    Same thing here in this case?

18       A    It appears that it's moving in that

19   direction.

20       Q    So the next topic which is topic six, which

21   is Fourth Amendment search and seizure about the

22   policies, practices and procedures and customs.

23            Can you talk a little bit about the city

24   and the department's policies?

25       A    Well, very similar.  We kind of rely on the

CARL KINNISON 1/7/2011

Page 31

1    institutional knowledge from the academy that any

2    changes or modifications.  You know, recently there

3    was a Supreme Court case dealing with a search

4    incident to arrest in a vehicle and searching the

5    interior of that vehicle.  We put that information

6    out when there are those kinds of changes.

7            Every two or three years we usually have

8    somebody that does a search and seizure training,

9    either Morley Swingle or Dr. Michael Brown who is in

10   charge of the regional academy.  They provide search

11   and seizure training for us and they will update our

12   officers on that as well.

13       Q   And you would use the roll call as well if

14   it was appropriate and timely?

15       A   Yes.

16       Q   On the search and seizure, if there is a

17   training tip or memo or even on those other things

18   that I've just described, you know, the probable

19   cause, who is the one that drafts them?

20       A   It's different.  We usually assign an

21   officer who maybe works in that area.  We do have a

22   training officer and sometimes that officer will do

23   the training tips.  Our assistant chief,

24   lieutenants, it just kind of depends on who may be

25   more the subject matter expert than someone else or

CARL KINNISON 1/7/2011

Page 32

1    who it seems to fall in line with.  It is not one

2    individual.

3        Q   If I said today there is a search and

4    seizure case that just happened in the Supreme

5    Court, do you have someone in mind who you would

6    assign it to?

7        A   Yes, probably my assistant chief.

8        Q   Is he considered your expert in that or

9    that's his subject area?

10       A   Well, yeah.  We have our investigation

11   supervisor or patrol commander.  All of them are

12   pretty astute and knowledgeable of the criminal law.

13       Q   And who would do probable -- if I had a

14   probable cause case, who would you assign that to?

15       A   Probably one of those same individuals.

16       Q   How about a First Amendment case, who would

17   do that?

18       A   Probably one of the same individuals.

19       Q   When those folks are writing these memos,

20   Prosecutor Swingle, does he have a role in that?

21       A   Yes, more consulting than anything.  If we

22   have a question, if it's not clear, often times we

23   will take the information that we're getting from

24   either from a law enforcement periodical or a

25   bulletin and many times it's simply repeating that

CARL KINNISON 1/7/2011

1  information, but if there is clarification that is

2  needed, we will often times consult with Morley.

3      Q   Does he have approval authority?  I mean,

4  does he initial it and say I validate, this law is a

5  good law or --

6      A   I'm not sure I understand what you're

7  asking.  He does not sign off on anything.

8  Typically, the way it goes is, we will call him on

9  the phone or often times he comes in in the morning

10 picking up our warrant applications and we will just

11 say, Morley, do you have a minute, we want to run

12 something by you.  He'll sit down and we'll discuss

13 it and then we use that information.

14          Occasionally, he will send us something, a

15 letter outlining some item that has changed and we

16 will simply attach that to the training tip.  So in

17 those cases he has literally signed off on it, but

18 for the most part, no, we are getting information

19 from him and then incorporating that in our training

20 tip.

21     Q   How often -- does your department more

22 interact with the county prosecutor for the criminal

23 things that you do or is it with the city?

24     A   Typically, but not always.  Sometimes it

25 depends.  If it is specifically related to the city

CARL KINNISON 1/7/2011

Page 34

1    or a city ordinance, we will often times get

2    information from our city prosecuting attorney,

3    sometimes from our city attorney.

4              I recall one dealing with open records

5    that our city attorney dealt with, but mostly for

6    the criminal and search and seizure, we normally

7    consult with our county prosecuting attorney.

8    Q    Number seven, final topic.  Fifth Amendment

9    Due Process.  How much training and policies?  Do

10   you have written policies on due process?

11   A    Can you be a little more clear?  I mean, I

12   understand what due process is, but are you

13   referring to anything in particular?

14   Q    How this case proceeded might be an example.

15   An officer reports, sees something, writes up a

16   probable cause statement.

17   A    In my perspective, that was the proper way

18   to do it.  I mean, we are taking an incident and

19   we're dealing with the opinion of a prosecuting

20   attorney as well as a Judge before we take any kind

21   of action.  So that, I mean, I don't know if we can

22   do anything better than that.

23   Q    There is no opinion sought.  I mean, the

24   probable cause statement was written and acted upon?

25   A    By the prosecutor.

CARL KINNISON 1/7/2011

1     Q   By a police officer with two years

2   experience, not a bad thing?

3     A   Right.

4     Q   And writes up a complaint against someone

5   with a law that is unconstitutional?

6         MR. SPRADLING:  Let me pose an objection.

7   First of all, it's not a complaint.  It's a probable

8   cause statement.

9         Second, the facts, the statute as written,

10  if it involves speech, it is probably

11  unconstitutional, but flag burning may not be, as

12  applied it may be unconstitutional in this case, but

13  flag burning may not be unconstitutional as a matter

14  of law because of it may not involve speech, so, I

15  will object to the form of the question on the basis

16  that you're saying it's an unconstitutional law

17  because, A, it hasn't been declared

18  unconstitutional.  It may be unconstitutionally

19  applied in this case.

20    Q   (By Mr. Doty) The probable cause statement

21  as written up.  You don't have any training in First

22  Amendment other than what they may have received and

23  he was speaking --

24    A   And I hate to say we don't have any training

25  in First Amendment because you do go through the

CARL KINNISON 1/7/2011

Page 36

1   amendments and you talk about what they are, so
2   likely, there is some training.  I just can't put my
3   finger on any that we may have had.
4        Q    But you just talked about how this is
5   playing out.  I mean, it's clearly something with
6   speech here.  I mean, he declared he was angry with
7   the government.  Have you declared a First Amendment
8   expert in your department and can say, let's review
9   this before we send this?  In other words, the
10  mechanisms.  It went from a second year police
11  officer to the prosecuting attorney, not seeking his
12  opinion, but seeking his signature, at least,
13  notifying him.  There wasn't an opinion asked, was
14  there?
15       A    Every time, the way I look at it, every time
16  you send a probable cause statement or affidavit to
17  the prosecutor, you're asking their opinion because
18  they then look at the facts and determine whether,
19  number one, the law, in fact, was violated and
20  whether the elements are there to indicate that such
21  is the case, so they examine that.  They look at it
22  and determine whether or not a criminal charge has
23  occurred.  They then issue the warrant and go to the
24  Judge and the Judge examines it and goes through the
25  same process and signs it.

CARL KINNISON 1/7/2011

Page 37

 1           So in a sense that is asking for their

 2    opinion.  That is the way I see it because we don't

 3    always get warrants.

 4        Q   But to the extent that you said your

 5    position is, if a law is unconstitutional, your

 6    officers are not supposed to enforce it.  They will

 7    not send a probable cause statement to someone,

 8    right, because there is no probable cause?

 9        A   If it gets to the point that some authority,

10    whether it be the county prosecuting attorney or

11    city attorney tells us that this is no longer

12    constitutional, don't enforce this under any

13    circumstance then, yes, we will.

14        Q   So you need that?  You won't independently

15    make that choice.  You won't independently say it's

16    unconstitutional.  Your officers are out there and

17    they absolutely know what they're doing is

18    unconstitutional?

19        A   Right.  I think if citizens were to ask me

20    why we are not enforcing the law, I need to have a

21    greater or higher authority that I can say -- and

22    typically, the prosecutor is the person that makes

23    the call whether or not they are going to charge a

24    crime.  And if they are saying that they are not

25    going to charge this particular crime, then I think

CARL KINNISON 1/7/2011

Page 38

1   that's sufficient for me to tell my officers not to

2   enforce this law.

3       Q   So it is necessary.  It is necessary that

4   the lawyer tell you that it's unconstitutional?

5       A   It certainly is a comfort level.  I wouldn't

6   make that decision without consulting with an

7   attorney, without consulting with our prosecuting

8   attorney and our city attorney.

9       Q   With respect to the due process, they sent--

10  your officers communicate or transmit this probable

11  cause statement.  The warrant that is produced from

12  that, is that all the prosecutor's office?  Does the

13  police department play any role in the warrant?

14      A   I'm not sure I understand.  We send it to

15  the prosecutor's office and then they make a

16  decision whether to issue a warrant based on that.

17      Q   And who writes up the warrant?

18      A   They do.

19      Q   They write it up?

20      A   Yes.

21      Q   And then you execute it?

22      A   Yeah, they send it back.  And if they issue

23  the warrant, they will fax it back to us or let us

24  know when the warrant was signed, but then we are

25  pretty much done with it.

CARL KINNISON 1/7/2011

Page 39

1     Q    Except to execute that?

2     A    Right, if they issue the warrant.

3     Q    When you transmit the probable cause

4   statement to Prosecutor Swingle, what else goes with

5   it?  I mean, is it evidence, is it pictures?  Does

6   he see the file?

7     A    Yes.  In fact, they want as much information

8   as they can get.  So we try to include everything

9   that we have, whether we take pictures of the

10  evidence, any statements that we have, the incident

11  report itself.  Anything at all that will help

12  substantiate that that criminal violation occurred.

13    Q    So the pictures that we have and Officer

14  Peters' incident report, those things would have

15  been included?

16    A    Yes, in any case.  I mean, they want to see

17  that.

18    Q    I appreciate your time.  Thanks so much.

19         MR. SPRADLING:  We will waive.

20

21

22

23

24

25

CARL KINNISON 1/7/2011

```
 1              CERTIFICATE OF REPORTER

 2          I, Linda DeBisschop, Certified Shorthand

 3      Reporter, Notary Public within and for the

 4      State of Missouri, do hereby certify that the

 5      witness whose testimony appears in the

 6      foregoing deposition was duly sworn by me; the

 7      testimony of said witness was taken by me to

 8      the best of my ability and thereafter reduced

 9      to typewriting under my direction; that I am

10      neither counsel for, related to, nor employed

11      by any of the parties to the action in which

12      this deposition was taken, and further that I

13      am not a relative or employee of any attorney

14      or counsel employed by the parties thereto, nor

15      financially or otherwise interested in the

16      outcome of the action.

17

18

19                      _____

20                      Notary Public within and for

21                      the State of Missouri

22

23

24

25
```